**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **ALEX BRAITBERG**, on behalf of himself and all others similarly situated,<br><br>              Plaintiff,<br><br>         v.<br><br>**CHARTER COMMUNICATIONS, INC.,**<br><br>SERVE:<br>CSC–Lawyers Incorporating Service Company<br>221 Bolivar Street<br>Jefferson City, MO 65101<br><br>            Defendant. | **Case No.:**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Alex Braitberg ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his counsel, brings this Class Action Complaint against Defendant Charter Communications, Inc., ("Defendant" or "Charter").  Plaintiff, on his own behalf and on behalf of a class of similarly situated individuals, alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

### I.  NATURE OF THE ACTION

1.      Cable and satellite television are a staple in American households, viewed by many to be as ordinary and essential as gas and electric service.  As a rapidly expanding provider of cable services throughout the nation, Charter uses its position to collect personal information – such as names, addresses, social security numbers, and credit card numbers – from tens of millions of consumers across the country.

2.      After consumers terminate their service with Charter, however, and this information is no longer needed to provide service or collect payment, Charter continues to maintain personally identifiable information on all of its previous customers indefinitely.  This conduct violates the Cable Communications Policy Act, 47 U.S.C. § 551, *et. seq.* ("CCPA"), which requires cable operators to destroy personally identifiable information when it is no longer required for the purpose for which it was collected.

3.      Accordingly, Plaintiff asserts claims on his own behalf and on behalf of the other members of the below-defined Class for violations of the CCPA, 47 U.S.C. § 551(e).

## II.  <u>JURISDICTION AND VENUE</u>

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which confers upon the Court original jurisdiction over all civil actions arising under the laws of the United States, and pursuant to 18 U.S.C. §§ 2520 and 2707 and 18 U.S.C. § 1030.

6.      In addition, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  In the aggregate, Plaintiff's claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interest and costs, and there are numerous class members who are citizens of states other than Charter.

7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1301(a)(2), 1391(b)(2), and 1391(c)(2) as: a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this District, and Charter conducts substantial business in this District.  Specifically, Charter provides cable and Internet services for residents and commercial facilities in towns and cities throughout this District, subjecting it to this Court's personal jurisdiction and making it a "resident" of this District for purposes of venue.

### III.  PARTIES

*Plaintiff*

8.      Alex Braitberg is a natural person and citizen of the State of Missouri.

*Defendant*

9.      Charter is a Delaware Corporation with its principal place of business in St. Louis County, State of Missouri.

### IV.  FACTUAL BACKGROUND

*The Cable Communications Policy Act*

10.      On October 30, 1984, Congress passed the Cable Communications Policy Act ("CCPA") in order to promote competition among providers of cable services and establish a national policy concerning cable communications and their operators.  An important objective of Congress in establishing such a policy was to protect cable subscribers' sensitive personal information from misuse and improper disclosure. To that end, Congress made sure that the Act incorporated privacy guidelines jointly established several years earlier by the 34 nations comprising the Organization for Economic Cooperation and Development.

11.      When the CCPA was under debate, legislative leaders noted that both common-sense privacy concerns and the constitutional rights of citizens were at stake:

> Cable systems, particularly those with a 'two-way' capability, have an enormous capacity to collect and store personally identifiable information about each cable subscriber.  Subscriber records from interactive systems can reveal details about bank transactions, shopping habits, political contributions, viewing habits and other significant personal decisions.  It is [therefore] important that national cable legislation establish a policy to protect the privacy of cable subscribers.  A national policy is needed because, while some franchise agreements restrict the cable operator's use of such information, privacy issues raise a number of federal concerns, including protection of the subscribers' first, fourth, and fifth amendment rights.  At the same time, such a policy must also

recognize and unnecessarily or unreasonably impede those flows
of information necessary to provide the service to the subscribers.

H.R. Rep. 98-934 at 4666-67 (1984).

12.   These observations, now nearly 30 years old, are just as relevant today. Subscribers continue to disclose some of their most sensitive identifying information to their cable operator as a condition to entering into a contract for service. Now – far more than ever before – Charter and other cable operators are equipped to rapidly collect and indefinitely retain large volumes of this valuable data in their electronic records.

13.   There are numerous serious and troubling privacy issues implicated by Charter's practice of retaining and misusing their former customers' personal information, including the risk of identity theft and conversion of personal financial accounts.

14.   Accordingly, the CCPA affords consumers significant protection with respect to the collection, maintenance, and disclosure of personally identifiable information ("PII") provided by the subscriber to the cable operator.

15.   Specifically, the CCPA requires cable operators to provide annual notice setting forth the "nature of personally identifiable information collected;" "the nature, purpose, and frequency of any disclosure" of that information; the "period during which such information will be maintained;" "the times and place at which the subscriber may have access to such information;" and the limitations imposed on the cable operator by this provision of the CCPA. 47 U.S.C. § 551(a)(1).

16.   In addition, the CCPA governs the way that cable operators are to destroy the PII of former subscribers. The CCPA requires that cable operators must destroy the PII of former subscribers "if the information is no longer necessary for the purpose for which it was collected" and there are no outstanding requests or orders for such information. 47 U.S.C. § 551(e).

-4-

17.     Under the CCPA, "personally identifiable information" is not specifically defined. However, the courts have concluded that it broadly encompasses "specific information about the subscriber, or a list of names and addresses on which the subscriber is included."[1]

**Charter's Collection of Consumers' PII**

18.     Charter requires that subscribers provide PII to Charter in order to receive cable service, including social security numbers and/or driver's license numbers, street addresses, phone numbers, financial information, bank account information, and credit card information.

19.     Once Charter obtains that information, it maintains a digital record system with every subscriber's personal information, adding to each consumer's file as they acquire more information.

20.     Charter's Privacy Policy, available online, provides, in pertinent part, as follows:

> Charter uses its system to collect personally identifiable information about You …. Personally identifiable information is any information that identifies or can potentially be used to identify, contact, or locate You. This includes information that is used in a way that is personally identifiable…including, but not limited to, name, address, phone or fax number, email address, spouses or other relatives' names, drivers license or state identification number, financial profiles, social security number, bank account information, and credit card information.

**Charter's Unlawful Retention of Consumers' PII**

21.     At all relevant times, Charter's uniform policy and practice has been to retain customer PII indefinitely, long after customers' accounts have been terminated.

22.     Charter's uniform policy and practice of retaining customer PII indefinitely is not necessary or required to satisfy any tax, accounting or legal obligations.

23.     Charter's uniform policy and practice of retaining customer PII indefinitely violates the CCPA, which requires cable operators to "destroy personally identifiable

---

[1] *See, e.g.*, *Scofield v. Telecable of Overland Park, Inc.*, 973 F.2d 874, 876 fn. 2 (10th Cir. 1992).

information if the information is no longer necessary for the purpose for which it was collected."

47 U.S.C. § 551(e).

*Consumers Place a High Value on Their PII*

24.     At a Federal Trade Commission ("FTC") public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information as follows:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy.  Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[2]

25.     Though Commissioner's Swindle's remarks are more than a decade old, they are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 billion per year online advertising industry in the United States.[3]

26.     The FTC has also recognized that consumer data is a new – and valuable – form of currency.  In a recent FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point by observing:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information

---

[2] *The Information Marketplace: Merging and Exchanging Consumer Data*, http://www.ftc.gov/bcp/workshops/infomktplace/transcript.htm (last visited May 20, 2012).

[3] *See Web's Hot New Commodity: Privacy*, http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited May 20, 2012).

may be commercially valuable.  Data is currency.  The larger the
data set, the greater potential for analysis – and profit.[4]

27.     Recognizing the high value that consumers place on their PII, many companies now offer consumers an opportunity to sell this information to advertisers and other third parties. The idea is to give consumers more power and control over the type of information that they share – and who ultimately receives that information.  And by making the transaction transparent, consumers will make a profit from the surrender of their PII.[5]   This business has created a new market for the sale and purchase of this valuable data.[6]

28.     In fact, consumers not only place a high value on their PII, but also place a high value on the *privacy* of this data.  Thus, the question is not *whether* consumers value such privacy; the question is "*how much* [consumers] value" that privacy.[7]

29.     Researchers have already begun to shed light on how much consumers value their data privacy – and the amount is considerable.  Indeed, studies confirm that "when [retailers']

---

[4] *Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited May 20, 2012).

[5] *You Want My Personal Data? Reward Me for It*, http://www.nytimes.com/2010/07/18/business/18unboxed.html (last visited May 20, 2012).

[6] *See Web's Hot New Commodity: Privacy*, http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited May 20, 2012).

[7] Hann *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at 2, *available at* http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (emphasis added) (last visited April 25, 2012).

privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[8]

30.     Consumers thus value their personal data highly, and place an economic value on the privacy of that data.  In fact, when consumers were surveyed as to how much they valued their personal data in terms of its protection against improper access and unauthorized secondary use – two concerns at issue here – they valued the restriction of improper access to their data at between $11.33 and $16.58 per website, and prohibiting secondary use to between $7.98 and $11.68 per website.[9]

31.     Given these facts, any company that transacts business with a consumer and then retains that consumer's PII in contravention of statutorily guaranteed privacy protections has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

***Facts Pertaining to Plaintiff Alex Braitberg***

32.     On or about July of 2007, Alex Braitberg signed up for Charter cable services.  In order to activate his service, Charter required Braitberg to provide Charter with various forms of PII, including his address, telephone number, and social security number.

33.     On or about June of 2010, Braitberg canceled his service with Charter.

34.     On or about March of 2013, Braitberg contacted Charter and confirmed that all of the PII that he originally submitted back in July of 2007 remains in Charter's system.

---

[8] Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (June 2011).

[9] *Id.*

## V.   CLASS ACTION ALLEGATIONS

35.     Plaintiff brings Count I, as set forth below, on behalf of himself and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All persons in the United States who signed up for cable service with Charter, and whose personally identifiable information was retained by Charter after the termination of services (the "Class").

Excluded from the Class are Charter and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and any immediate family members thereof.

36.     Certification of the Plaintiff's claims for classwide treatment is appropriate because Plaintiff can prove the elements of his claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

37.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the class are so numerous that individual joinder of all Class members in impracticable. On information and belief, there are thousands of consumers who have been affected by Charter's wrongful conduct.  The precise number of the Class members and their addresses is presently unknown to Plaintiff, but may be ascertained from Charter's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

38.     **Commonality and Predominance – Federal  Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a. whether Charter engaged in the conduct as alleged herein;

b. whether Plaintiff and the other Class members are entitled to actual, statutory, or other forms of damages, and other monetary relief and, if so, in what amount(s); and

c. whether Plaintiff and other Class members are entitled to equitable relief, including but not limited to injunctive relief and restitution.

39.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform misconduct described above.

40.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4)**. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class members he seeks to represent; he has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously.  The Class members' interests will be fairly and adequately protected by Plaintiff and his counsel.

41.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**  Charter has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to Class members as a whole.

42.     **Superiority – Federal Rule of Civil Procedure 23(b)(3)**.   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Charter, so it would be impracticable for Class members to individually seek redress from Charter's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.  <u>CLAIMS ALLEGED</u>

### <u>COUNT I</u>
**Failure to Destroy Personally Identifiable Information**
**Violation of § 551(e) of the Cable Communications Policy Act**
**(On Behalf of the Class)**

43.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-42 as though fully set forth herein.

44.     Charter is a "cable operator" as defined by the CCPA because Charter provides "cable services," which is "the one-way transmission to subscribers of [ ] video programming, or [  ] other programming service; [and] subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service." 47 U.S.C. § 522(5) & (6).

45.     The CCPA mandates, among other things, that a cable operator "destroy personally identifiable information if the information is no longer necessary for the purpose for which it was collected." 47 U.S.C. § 551(e).

46.     After Plaintiff's and the Class members' accounts were terminated, Charter continued to maintain Plaintiff's and the Class members' PII, even though such information was no longer necessary to maintain for the purpose for which it was collected.

47.     The foregoing conduct violates 47 U.S.C. § 551(e).

48.     Plaintiff and the Class have suffered injuries as a result of Charter's violation of 47 U.S.C. § 551. Charter's failure to destroy their PII, as required 47 U.S.C. § 551, constitutes injury in the form of a direct invasion of their federally protected privacy rights.

49.     Moreover, since Plaintiff and the Class purchased cable services from Charter, and Charter was obligated to comply with the CCPA, Charter's failure to destroy their PII deprived them of the full value of the services that they bargained and paid for. Because Plaintiff and the Class ascribe monetary value to their ability to control their PII, Plaintiff and the Class have sustained, and continue to sustain, monetary and economic injuries as a direct and proximate result of Charter's violation of 47 U.S.C. § 551.

50.     The CCPA provides a private right of action to consumers who have been aggrieved by a violation of 47 U.S.C. § 551.  Specifically, any person aggrieved by any act of a cable operator violating 47 U.S.C. § 551 may recover "actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher."  47 U.S.C. § 551(f)(2)(A).

-12-

51.     In addition, any person aggrieved by any act of a cable operator violating 47 U.S.C. § 551 may recover punitive damages and "reasonable attorneys' fees and other litigation costs reasonably incurred."  47 U.S.C. § 551(f)(2)(B)&(C).

52.     Plaintiff, on behalf of himself and the Class, therefore seeks redress as provided by 47 U.S.C. § 551, including liquidated damages to the full extent permitted by the CCPA, punitive damages, and reasonable attorneys' fees and other litigation costs.

## VII.   JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint so triable.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter an Order awarding the following relief:

A.  Declaring that this action may be maintained as a class action, and certifying the Class as requested herein;

B.  Enjoining Charter from the unlawful practices and statutory violations asserted herein;

C.  An Order awarding liquidated damages pursuant to the CCPA;

D.  An Order awarding punitive damages pursuant to the CCPA;

E.  An Order awarding attorneys' fees and costs pursuant to the CCPA; and

F.  Such other and further relief as may be just and proper.

Dated: March 15, 2013

Respectfully submitted,

**Alex Braitberg**, on behalf of himself and all others similarly situated


By: */s/ Ryan Keane*
    One of the Attorneys for Plaintiff
    And the Proposed Putative Classes

**THE SIMON LAW FIRM, P.C.**

*/s/ Ryan Keane*
John G. Simon, # 35231MO
Anthony G. Simon, # 38745MO
Ryan A. Keane, # 62112MO
800 Market Street, 17th Floor
St. Louis, Missouri 63101
P. 314.241.2929
F. 314.241.2029
rkeane@simonlawpc.com

   and

Joseph J. Siprut*
*jsiprut@siprut.com*
Aleksandra M.S. Vold*
*avold@siprut.com*
Gregg M. Barbakoff*
*gbarbakoff@siprut.com*
**SIPRUT PC**
17 North State Street, Suite 1600
Chicago, Illinois  60602
Tel:  312-236-0000
Fax:  312-948-9212

* *Pro Hac Vice* application to be submitted